**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

UNITED STATES OF AMERICA

v. Case No. 6:16-cr-239-Orl-37TBS

BRANDON LEE MOJICA.

---

**ORDER**

This cause is before the Court on the following:

1. Government's Motion for Revocation of Release Order (Doc. 33), filed December 8, 2016; and

2. Defendant's Response to Government's Motion for Revocation of Bond Order (Doc. 37), filed December 14, 2016.

Upon consideration, the Court finds that the motion is due to be granted.

**OVERVIEW**

In the instant criminal action, the Government has accused Defendant Brandon Lee Mojica ("**Mojica**") of aiding and abetting an accomplice by the name of Ricardo Rodriguez Jr. ("**Rodriguez**") in the commission of the armed robbery of a bank ("**Bank**") located in Lake Mary, Florida, on November 8, 2016 ("**Robbery**"). (*See generally* Doc. 1 ("**Complaint**").) At the time of the Robbery, Mojica was an employee of the Bank.[1] (*Id.* ¶ 4.) According to the Complaint, Mojica and Rodriguez discussed robbing the Bank on several occasions prior to the Robbery—including the evening of November 7, 2016, at which time Mojica informed Rodriguez that he would be opening the bank the following

[1] Mojica worked at the Bank from August to November of 2016. (*See* Doc. 38, p. 5.)

day with one other person. (*Id.* ¶¶ 13, 14, 19.) Prior to the Robbery, Mojica also allegedly provided information to Rodriguez regarding his coworkers at the Bank, which Rodriguez recorded in a notebook ("**Notebook**") found on his person at the time of his arrest. (*Id.* ¶¶ 10, 15.)

Ultimately, Mojica was arrested on November 9, 2016.[2] That same day, he and Rodriguez appeared before U.S. Magistrate Judge Karla R. Spaulding for their initial appearances, at which time the Government sought detention of both defendants. (Doc. 2.) At his initial appearance, Mojica waived his preliminary hearing and requested a continuance of the detention hearing, which Magistrate Judge Spaulding granted. (*Id.*)

On November 30, 2016, a grand jury returned a true bill indicting Mojica for the crimes of: (1) aiding and abetting another in the commission of a bank robbery by means of force, violence, and intimidation (Count I); and (2) aiding and abetting another in the commission of a crime of violence—specifically, an armed bank robbery—during which a firearm was used, carried, and brandished (Count II).[3] (Doc. 16 ("**Indictment**").) In the interim, Magistrate Judge Spaulding ordered that Mojica be detained pending trial. (*See* Doc. 15.)

Mojica subsequently moved for a bond hearing ("**Bond Hearing**"), which was held before U.S. Magistrate Judge Thomas B. Smith on December 8, 2016. (Docs. 26, 29.) At the conclusion of the Bond Hearing, Magistrate Judge Smith ordered that Mojica be released on certain conditions, including home confinement, electronic monitoring, and the execution of a bond in the amount of $250,000, pursuant to which Mojica's parents

---

[2] *See* unnumbered docket entry immediately following Complaint.
[3] Rodriguez was indicted separately and is being prosecuted in a separate proceeding. *See United States v. Rodriguez*, Case No. 6:16-cr-238-Orl-37TBS.

pledged their home as collateral ("**Release Order**"). (Docs. 29, 30, 31.)

The following day, the Government moved for revocation of the Release Order. (Doc. 33 ("**Revocation Motion**").) Mojica filed a response in opposition to the Revocation Motion (Doc. 37), and the Court held a second evidentiary hearing on December 15, 2016 ("**Second Evidentiary Hearing**"), after which the Court took the matter under advisement (Doc. 40). This Order memorializes the Court's ruling on the Revocation Motion, as well as the testimony presented at the Bond Hearing and Second Evidentiary Hearing (collectively, "**Hearings**").

## EVIDENCE PRESENTED AT BOND HEARING

At the Bond Hearing, the Government presented the testimony of investigating officer Special Agent John Steven McElyea ("**Agent McElyea**") and Bernice Martell ("**Martell**"), a service manager at the Bank who was present at the time of the Robbery. (Doc. 29; *see also* Doc. 38, p. 25.) For its part, defense counsel ("**the Defense**") proffered: (1) findings set forth in the pretrial services report; (2) the names of witnesses in attendance in support of Mojica's release; and (3) that Mojica's parents and uncle were willing to co-sign a bond for his release and offer his parents' home as collateral. (Doc. 29; Doc. 38, pp. 34–36.)

### A. Testimony of Agent McElyea

Agent McElyea, along with two other officers, responded to the scene of the Robbery on November 8, 2016. (Doc. 38, p. 4.) According to the Agent's testimony, Martell arrived at the Bank at approximately 7:40 a.m. on the day of the Robbery. (*Id.* at 5.) Mojica was the second person to arrive. (*Id.*) As Martell was opening the door to let Mojica into the Bank, Rodriguez arrived at the front door brandishing a small silver pistol

("**Gun**"), which he used to force Mojica and Martell into the vault area of the Bank to open the vaults. (*Id.* at 5, 6.) After Mojica and Martell opened one of the vaults, Rodriguez filled the backpack ("**Backpack**") he was carrying with approximately $295,000, zip tied Mojica and Martell's hands behind their backs, poured bleach over various surfaces, instructed Mojica and Martell to get on their knees, and fled the scene on a bicycle with the Backpack. (*Id.* at 5–6.)

After Rodriguez left, Martell was able to free herself from the zip ties and call 911. (*Id.* at 6.) She was connected to the Lake Mary Police Department and gave a description of Rodriguez to the police. (*Id.*) The police subsequently located Rodriguez, who then dropped the Backpack,[4] entered a vehicle, and fled. (*Id.*) After a limited pursuit, Lake Mary authorities apprehended Rodriguez. (*Id.* at 7.) At the time of his arrest, Rodriguez was carrying the Notebook and two stacks of $1 bills totaling $200. (*Id.*)

The information contained in the Notebook included: (1) various scenarios for committing a bank robbery; (2) the names and schedules of employees working at the Bank on the day of the Robbery; (3) the time that Martell and Mojica would be working at the Bank on the morning of Robbery; (4) personal information about Martell, her four children, and her husband—including his occupation at a prison; (5) threats directed toward Martell's husband; and (6) statements that Rodriguez had been surveilling Martell's family for weeks. (*Id.* at 9, 10–12.) During his post-*Miranda* interview, Rodriguez confessed that, although he recorded the information in the Notebook, Mojica was the source of such information. (*Id.* at 9, 10.) Mojica corroborated this statement during his

[4] The Backpack was later recovered. (Doc. 38, p. 7.) It contained the Gun and approximately $295,000. (*Id.*)

own post-*Miranda* interview. (*Id.* at 13–14.)

Rodriguez also admitted that: (1) he and Mojica met the night before the Robbery and watched a movie depicting a bank robbery scene; (2) Mojica informed him that he would be opening the Bank on November 8, 2016; and (3) when he asked Mojica about using the Gun during the Robbery, Mojica requested that, for safety purposes, he either not put a bullet in the chamber or not put any bullets in the Gun at all. (*Id.* at 10.) Mojica corroborated much of Rodriguez's statements and also confessed that: (1) he and Rodriguez were lifelong friends; (2) he had discussed his employment at the Bank with Rodriguez; and (3) he knew that the Gun used by Rodriguez had four bullets. (*Id.* at 13–15.)

On cross-examination, Agent McElyea revealed that: (1) Rodriguez was wearing makeup on the day of the Robbery, as well as apparatus to disguise his nose and chin; (2) the Notebook contained codes to the Bank vault; (3) Mojica had codes to the safe area on a cell phone; and (4) Mojica voluntarily agreed to be interviewed by law enforcement at the Bank following the Robbery and did not attempt to flee after he had identified Rodriguez. (*Id.* at 19, 21, 22, 24.)

**B. Testimony of Martell**

Martell testified that she had worked at the Bank for five years and had interacted with Mojica on a daily basis during his tenure at the Bank. (*Id.* at 25, 29–30.) On the morning of the Robbery, Martell performed her customary walkthrough of the Bank. (*Id.* at 26.) As she proceeded to let Mojica into the Bank, Rodriguez "bum-rushed" the door brandishing the Gun, entered the Bank, and locked the door behind him. (*Id.*) Martell testified that, when she saw the Gun, she was frightened for both herself and Mojica. (*Id.*

at 28–29.) At this time, Rodriguez placed a gun to Martell's head. (*Id.* at 26.) According to Martell, Mojica moved her so that the Gun was no longer pointed at her head. (*Id.*)

Martell also testified that two people are required to open the Bank vault. (*Id.* at 26–27.) Notably, after Rodriguez entered the Bank, he forced both Martell and Mojica into the vault area and screamed at them to open the vault. (*Id.*) Once Martell and Mojica had opened the vault, Rodriguez placed the money inside the Backpack, zip tied Martell and Mojica's hands behind their backs, and poured bleach over the Bank surfaces. (*Id.* at 27.) Mojica then began yelling at Rodriguez repeatedly, stating: "That's enough. Just take the money and get out. Just leave us alone." (*Id.*) In response, Martell implored Mojica to keep quiet to avoid aggravating Rodriguez. (*Id.*) Following this exchange, Rodriguez instructed Mojica and Martell to get on the floor; immediately thereafter, he stormed out of the Bank. (*Id.*) Martell was subsequently able to free her hands from the zip ties and push the Bank's "hold-up alarm." (*Id.* at 27–28.) She then called law enforcement while attempting to untie Mojica's hands. (*Id.* at 28.)

According to Martell, she and Mojica both live in Deltona, Florida. (*Id.* at 29, 31.) During the course of their mutual employment at the Bank, Martell shared personal information with Mojica—including the fact of her husband's employment at a prison. (*Id.* at 29–30, 31.) Martell also shared that Mojica had met her twelve-year-old daughter on two occasions. (*Id.* at 30.) Martell testified that she would be afraid for her safety if Mojica was released from detention because he knows where she works, where her husband works, and what her children look like. (*Id.* at 31.) Specifically, Martell testified that she feared being followed by Mojica. (*Id.*)

### C. Other Proffered Evidence

In addition to cross-examining Agent McElyea and Martell, the Defense proffered the names and occupations of twenty witnesses who attended the Bond Hearing in support of Mojica's release. (Doc. 36; *see also* Doc. 38, pp. 34–36.) The Defense also informed the Court that Mojica's parents were willing to act as third-party custodians, keep Mojica at their home in the event of his release, and put up their home—in which they have $80,000 in equity—as collateral for co-signing a bond. (Doc. 38, p. 36.) Additionally, the Defense represented that Mojica's uncle—a long-time resident of Deltona, Florida—was willing to co-sign a bond. (*Id.*) Finally, the Defense proffered information set forth in the pretrial services report, including Mojica's: (1) long-standing employment history; (2) enlistment with the Marines; (3) lack of criminal history; and (4) outstanding family support. (*Id.*)

## MAGISTRATE JUDGE SMITH'S RELEASE ORDER

At the conclusion of the Bond Hearing, Magistrate Judge Smith ordered that Mojica be released on following conditions: (1) that Mojica, his parents and his uncle execute a bond—secured by his parents' home—in the amount of $250,000; (2) that Mojica's parents act as third-party custodians; (3) that Mojica be confined to his parents' home and monitored electronically; (4) that Mojica restrict his travel to the boundaries of his parents' home[5]; (5) that Mojica surrender his passport, if applicable; (6) that Mojica be prohibited from applying for any international travel documents during the pendency of

---

[5] Under his current conditions of release, Mojica is, however, permitted to leave his parents' home "to meet with his lawyer to defend this case, to appear in court on this case, to meet with experts, if his lawyer deems that necessary, for religious purposes, . . . for medical purposes[,]" and with the advance approval of the Court or Pretrial Services. (Doc. 38, p. 47.)

this case; (7) that Mojica be prohibited from possessing any firearms, weapons, or destructive devices on his person, in his residence, or in any vehicle that he occupies; (8) that Mojica be barred from communicating by any means with any witnesses or his co-defendant; and (9) that Mojica refrain from alcohol abuse and all drug use, save for over-the-counter medication and drugs prescribed to him by a medical doctor. (*Id.* at 46–48; *see also* Doc. 30 (“**Pretrial Release Order**”).)

In response, the Government made an ore tenus motion for temporary stay of the Pretrial Release Order in order to seek leave to appeal (“**Motion for Stay**”). (Doc. 38, p. 49.) After taking the Motion for Stay under advisement (*id.*), Magistrate Judge Smith issued a written order denying such motion (Doc. 28). The instant appeal followed.

## EVIDENCE PRESENTED AT SECOND EVIDENTIARY HEARING

### I. Additional Testimony from Agent McElyea

At the Second Evidentiary Hearing, Agent McElyea clarified the sequence of events on the day of the Robbery. According to the Agent’s testimony, Rodriguez left the Bank at approximately 7:58 a.m. Ten minutes later, Rodriguez was apprehended. Mojica and Martell were then brought separately to the scene of the apprehension, where they each identified Rodriguez as the bank robber. Shortly thereafter, Mojica and Martell were taken back to the Bank and interviewed.

During Mojica’s first interview, he stated that he did not recognize Rodriguez during the Robbery; however, when taken to the location where Rodriguez was apprehended, Mojica identified Rodriguez as a lifelong friend. After Rodriguez made statements to law enforcement implicating Mojica in planning the Robbery and providing the information recorded in the Notebook, Mojica was interviewed a second time at the Lake Mary Police

Department, at which time he admitted his involvement with Rodriguez. Though Agent McElyea acknowledged that Rodriguez was wearing a disguise during the Robbery, he opined that it was not a very good disguise.

**II. Additional Testimony from Martell**

Martell also provided additional testimony. Specifically, she testified that despite the conditions imposed on Mojica in the Pretrial Release Order, she continued to feel a threat to her safety. Martell reported that she had not been able to sleep and had taken extra precautions by informing her children's school of the situation, ensuring that she alone transports the children to and from school, and instructing her children not to go anywhere with anyone else. When asked why she continues to fear for the safety of her family, Martell pointed to the threats recorded in the Notebook that implied harm to her children and husband if she did not comply with the Robbery. Martell testified that by the time any electronic monitoring was breached, "the damage would be done" and her "kids would be harmed."

On cross examination, Martell admitted that since her release, Mojica had not contacted her or threatened her. She also testified that she had not received any verbal threats from anyone else.

**III. Proffer of Additional Supporting Witnesses and Additional Collateral**

In addition to the witnesses in attendance at the Bond Hearing, six new witnesses attended the Second Evidentiary Hearing in support of Mojica's release. Additionally, Mojica's uncle—Santos Mojica ("**Santos**")—testified that he was willing to put up his truck as further collateral for Mojica's bond. According to Santos, the truck is worth $30,000 and is the sole means for conducting his grocery transport business.

## STANDARDS

Upon motion by the Government, a district court is permitted to review a magistrate judge's release order. 18 U.S.C. § 3145(a)(1). However,

> where an original magistrate's release order is subsequently modified or set aside in accordance with the terms of the governing bail statues, the findings made and conclusions reached by the first magistrate to consider release do not have to be found to be clearly erroneous before any modification to the magistrate's order can be made. Rather the reviewing court . . . may conduct a *de novo* review of the same facts and considerations that impelled the original magistrate's order.

*United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir. 1985). In doing so, the district court is required to independently consider all of the facts properly before it. *See United States v. King*, 849 F.2d 485, 490 (11th Cir. 1988) (citing *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987). If additional evidence is required to resolve the motion, the district court may hold an additional evidentiary hearing. *Id.*

The Court's inquiry into the necessity of pretrial detention is guided by 18 U.S.C. § 3142. Specifically, the Court examines whether there are any conditions or combination of conditions which reasonably will assure the appearance of the defendant as required, as well as the safety of any other person and the community. 18 U.S.C. § 3142(e). A finding that the defendant is either a flight risk or a danger to the community is sufficient to detain the person pending trial.[6] *King*, 849 F.2d at 488. In making this determination, the Court considers the following § 3142(g) factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against

[6] The Government must prove that the defendant is a flight risk by a preponderance of the evidence or a danger to the community by clear and convincing evidence. *King*, 849 F.2d at 488–89.

the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

**DISCUSSION**

In considering the Revocation Motion, the Court must undertake an independent, de novo review of Magistrate Judge Smith's Pretrial Release Order. *United States v. Hurtado*, 779 F.2d 1467, 1480, 1481 (11th Cir. 1985). Ultimately, the Court must decide whether any condition or combination of conditions will reasonably assure: (1) the defendant's appearance during the required proceedings; and (2) the safety of any other person and the community. *Hurtado*, 779 F.2d at 1479. Upon consideration, the Court finds that no conditions of release will reasonably assure the safety of the Martell family or the community and, therefore, Mojica is due to be detained pending trial.

Important to the Court's analysis is Mojica's failure to rebut the statutory presumption that his continued release risks the safety of the Martell family and the community. Section 3142(e) of the Bail Reform Act creates several "rebuttable presumptions" that the Court must use in determining whether pretrial detention is necessary. *King*, 849 F.2d at 487. Germane to the instant proceeding is the statutory presumption created by § 3142(e)(3)(B), which provides that:

> [s]ubject to rebuttal by the [defendant], it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that that the person committed an offense under section 924(c), 926(a), or 2332b of this title.

("**Statutory Presumption**").

"Once the government makes a showing of probable cause that the defendant

committed one of the enumerated acts[,] this triggers the presumption that the defendant either constitutes a danger to the community or poses a risk of flight from justice." *Hurtado*, 779 F.2d at 1479 (citing 18 U.S.C. § 3142(e)). Here, Count II of the Indictment charges Mojica with violating 18 U.S.C. § 924(c)(1)(A)(ii), which sets forth a mandatory minimum penalty of seven years for brandishing a firearm during and in relation to any federal crime of violence.[7] (Doc. 16, p. 2.) "[T]o trigger section 3142(e)'s rebuttable presumption, the government need not make a showing of probable cause independent of the grand jury's indictment." *See King*, 849 F.2d at 487–88. Thus, the Statutory Presumption exists in this action.

After the Statutory Presumption is triggered, "it becomes the task of the defendant to come forward with evidence to meet his burden of production—that is, evidence to suggest that he is either not dangerous or not likely to flee if turned loose on bail." *Hurtado*, 779 F.2d at 1479. At a detention hearing, the defendant may satisfy this burden by testifying, presenting witnesses on his behalf, cross-examining any government witnesses, and presenting information by proffer or otherwise. *Hurtado*, 779 F.2d at 1479 (citing 18 U.S.C. § 3142(f)). However, even if the defendant presents sufficient evidence to rebut the Statutory Presumption, the effect of the presumption is not completely eliminated. *King*, 849 F.2d at 488. To this point, the "use of the word 'rebut' in this context is somewhat of a misnomer because the rebutted presumption is not erased. Instead it remains in the case as an evidentiary finding militating against release to be weighed

[7] A "crime of violence" includes: (1) an offense that has, as an element of the offense, the use, attempted use, or threatened use of physical force against the person or property of another; or (2) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense. 18 U.S.C. § 3156(4).

along with other evidence relevant to factors listed in section 3142(g)." *Id.*

"When the question is whether the defendant has successfully rebutted the presumption created in subsection (e), the judicial officer is directed to the four-part catechism of subsection (g)." *Hurtado*, 779 F.2d at 1479. To do so, the Court must consider the available information concerning:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of evidence against the person;
>
> (3) the history and characteristics of the person including—
>
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

In applying the foregoing factors, "a finding of either danger to the community *or* risk of flight will be sufficient to detain the defendant pending trial." *King*, 849 F.2d at 488. Here, although the Court does not necessarily disagree with Magistrate Judge Smith's factual findings, the Undersigned takes issue with his seemingly singular focus on the

Government's failure to demonstrate that Mojica was a flight risk.

As set forth above, upon consideration of the evidence presented at the Bond Hearing, the Statutory Presumption, and the § 3142(g) factors, Magistrate Judge Smith found that there were conditions upon which Mojica could be released. (Doc. 38, p. 43–46.) In so finding, Magistrate Judge Smith acknowledged Mojica's dangerousness but concluded that, because there was no risk of flight, he could be released on bond. (*Id.* at 45–46.)

Specifically, at the conclusion of the Bond Hearing, Magistrate Judge Smith first emphasized the policy underlying the Bail Reform Act, which "favors pretrial release on the least restrictive means that will ensure the safety of the community and the appearance of the defendant." (Doc. 38, p. 43.) Assessing the § 3142 factors under this policy, Magistrate Judge Smith found that: (1) the evidence presented supported the conclusion that Mojica actively planned and participated in a violent and vicious crime, abused the trust of his employer and coworkers to accomplish that crime, was willing to put the lives of other people in danger by helping to plan and participate in a crime that involved a loaded firearm, and actively participated in the planning and execution of a crime that involved pointing a gun at someone and making them believe that they may be killed at any moment; (2) the weight of the evidence against Mojica was substantial—as demonstrated by the handwritten notes in the Notebook and the confessions of both Mojica and Rodriguez; (3) Mojica faces substantial prison time if found guilty—specifically, a maximum of 32 years; (4) Mojica generally has no criminal history, enjoys significant family and community support, and was not on probation or parole at the time of the crime; and (5) Martell's fear for the safety of her family in the event of Mojica's

release was understandable in light of her testimony that: (a) she and Mojica reside in the same community; and (b) Mojica knows where she lives, had met her oldest daughter at community social events, and knew significant personal details about Martell and her family. (*Id.* at 43–45.)

Importantly, with respect to Mojica's dangerousness, Magistrate Judge Smith concluded that, based on the evidence presented, Mojica helped plan a crime that put Martell's life at risk and, as such, decided—before the crime was ever committed—that Martell's life was an acceptable risk in moving forward with the Robbery. (*Id.* at 45–46.) Immediately thereafter, however, Magistrate Judge Smith qualified these findings with the following statement:

> Having said all that, there's nothing that convinces me that [Mojica] is a risk of flight. As the defense noted, he didn't run on the day of the crime. He stayed. He was interviewed twice by law enforcement. During the second interview, he admitted his involvement in the crime. So I do think that there are conditions upon which he can be released.

(*Id.* at 46.)

Seemingly then, Magistrate Judge Smith rested his decision to release Mojica primarily on the absence of evidence that Mojica was a risk of flight. Because Mojica may be detained on either a finding of dangerousness *or* a risk of flight, the Court departs from Magistrate Judge Smith's ultimate ruling. In particular, though the Court agrees that Mojica has more than adequately rebutted the Statutory Presumption as it relates his risk of flight, the Court finds that Mojica has failed to offer sufficient evidence with respect to whether he poses harm to the community. Indeed, this second prong—which constitutes a critical factor here, where the Indictment charges the commission of a violent crime—compels detention.

Having now conducted an independent review of both the audio and written transcript of the Bond Hearing, as well as the additional testimony given by Martell at the Second Evidentiary Hearing, the Court finds that Mojica's continued liberty under the conditions imposed does not assuage the Court's concerns about his dangerousness to the community. Ordinarily, Martell's subjective fears would not be relevant to a finding of dangerousness; here, however, the objective facts render such anxiety well-founded. Indeed, the Statutory Presumption, the information set forth in the Notebook—which Mojica provided to Rodriguez, and Martell's testimony persuade the Court that the Government has carried its burden of persuasion in demonstrating that Mojica is a risk to the public.

Particularly disturbing to the Court is the information contained in the Notebook regarding the names and schedules of the Bank's employees, as well as the personal information disclosed by Mojica about Martell's family—including the number and gender of her children and the place of her husband's employment. (Doc. 38, p. 12.) The Court's concerns are only amplified by the apparent threats contained in the Notebook with respect to Martell's husband, which imply that Mojica and Rodriguez had the ability to harm Martell's husband at his place of employment. (*Id.* at 12 (containing a scripted threat stating: "her husband, who we're very fond of—one phone call to the prison, and he will have a very bad day at work").) Such evidence tends to show that Mojica and Rodriguez went so far as to discuss threatening Martell's husband by communicating with inmates in prison. Further, the evidence suggests that Mojica knew that these comments were intended to be delivered to Martell for the purpose of intimidating her. Whether Mojica has the means or ability to carry out such a threat cannot be conclusively determined by the

record, but detention alone forecloses any such opportunity.

Additionally, the health section of the pretrial services report notes that Mojica was Baker Acted in either 2012 or 2013 as a result of a domestic dispute with an ex-girlfriend. This evidence of psychological problems in the past and violence toward another person was unexplained by Mojica and is disconcerting when coupled with the violent nature of the crime for which he is currently facing charges. Notably, the planning of the Robbery and Mojica's knowledge that a firearm would be used suggests that he was unconcerned with Martell's safety. Therefore, consistent with the factors enumerated under § 3142(g)(3), the foregoing demonstrates a history and characteristics that pose a risk to the safety of the community.

As highlighted by the Defense, the Court acknowledges the apparent tension between the Statutory Presumption, the preference for release, and the presumption of innocence also set forth in the Bail Reform Act. Nonetheless, the Court must resolve that tension in accordance with the factors set forth in Act. Here, the violent nature of the crime creates a Statutory Presumption, which continues even in the midst of the evidence proffered by Mojica in favor of his release. Upon consideration of the evidence presented by both Mojica and the Government, the Court finds that Mojica did not come forward with sufficient evidence to overcome the Statutory Presumption and other evidence presented at the Hearings—namely, the circumstances of the offense, the information contained in the Notebook, and Martell's testimony. In so finding, the Court concludes that the Government has carried its burden of persuasion in establishing—by clear and convincing evidence—that no conditions of release will reasonably assure the safety of the Martell family or the community while Mojica remains at liberty. As such, the Court hereby

revokes the Pretrial Release Order issued and orders Mojica detained pending trial.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1. Government's Motion for Revocation of Release Order (Doc. 33) is **GRANTED**.

2. U.S. Magistrate Judge Thomas B. Smith's Order Setting Conditions of Release (Doc. 30) is **REVOKED**.

3. Defendant Brandon Lee Mojica shall be **DETAINED** pending trial.

4. Defendant Brandon Lee Mojica is **DIRECTED** to voluntarily surrender by **5:00 p.m.** on Tuesday, **December 20, 2016**, to the U.S. Marshal's Office located at the George C. Young U.S. Courthouse, 401 W. Central Boulevard, Suite 2300, Orlando, Florida.

5. In accordance with 18 U.S.C. § 3142(i), Defendant Brandon Lee Mojica shall be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons waiting or serving sentences or being held in custody pending appeal. Once in custody, Defendant shall be afforded reasonable opportunity for private consultation with his counsel. On order of the Court, or request by the Government, the corrections facility in which Defendant is confined shall deliver Defendant to a U.S. marshal for the purpose of an appearance in connection with a court proceeding.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on December 20, 2016.



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record

19